**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

JANE DOE,

Plaintiff,

v.

CENTURA HEALTH CORPORATION,

Defendant.

---

## COMPLAINT

---

Plaintiff Jane Doe, by and through her attorneys the National Association of the Deaf and the Civil Rights Education and Enforcement Center, hereby brings this Complaint against Defendant Centura Health Corporation for violation of Title III of the Americans with Disabilities Act ("Title III" or "ADA"), Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), and Section 504 of the Rehabilitation Act ("Section 504").

## <u>INTRODUCTION</u>

1.      Plaintiff Jane Doe is deaf and her primary language is American Sign Language ("ASL"). Plaintiff brings this action to challenge the failure of Defendant Centura Health ("Centura") to provide effective communication during Plaintiff Doe's admission and stay at the Porter Adventist Hospital ("Porter") Behavioral Health Unit between October 26 and November 4, 2016.

2.      Centura personnel provided an on-site sign language interpreter on only two brief occasions during that nine-day period. They attempted to communicate with Ms. Doe using

1

video remote interpreting ("VRI") on several other occasions, despite the fact that the technology repeatedly failed and the system, even when functional, was inappropriate in light of Ms. Doe's psychological symptoms. On other occasions, Centura personnel attempted to use Ms. Doe's family members as interpreters. For the remainder of her stay, including conversations with medical personnel and group therapy sessions, Ms. Doe had no interpreter at all.

3.      Centura is a non-profit corporation that had $191 million in assets according to its 2015 IRS Form 990. It operates 17 hospitals in Colorado and Kansas.

4.      Centura has been sued on at least two prior occasions for failing to provide effective communication for deaf patients and yet continues to violate the ADA, Section 1557, and Section 504.

5.      Ms. Doe brings this lawsuit to ensure that deaf and hard of hearing patients at Centura health care facilities receive effective communication and for redress for her injuries.

## JURISDICTION AND VENUE

6.      This action arises under the laws of the United States. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as all of the events giving rise to the claims occurred in the District of Colorado.

## PARTIES

8.      Plaintiff Jane Doe is currently and at all times relevant to this suit has been a resident of the State of Colorado. Ms. Doe is an individual with a disability because she is substantially limited in one or more major life activities, including hearing. Ms. Doe also has been diagnosed with mental illness.

9.     Defendant Centura Health Corporation is a non-profit corporation incorporated in the state of Colorado with its principal place of business in Centennial, Colorado. Centura owns and operates hospitals and other health care facilities in Colorado and Kansas, including but not limited to Porter Hospital in Denver, Colorado. Centura receives federal financial assistance as that term is used in Section 504 and Section 1557.

## FACTS

10.     Plaintiff Doe is deaf. She does not speak and she does not understand speech. Her primary language is ASL.

11.     The ASL-using deaf community in Denver is very small and close-knit. Community members regularly socialize together as adults, due in part to the difficulty of socializing with individuals who do not know ASL. Facilitated by social media, an individual community member's private information can become known to an entire network of people with whom they have regular, in-person interaction within a matter of hours.

12.     In order to communicate effectively with strangers who do not know ASL, in emotional situations, and/or in situations that call for more than routine language, Ms. Doe requires the services of a qualified sign language interpreter.

13.     At all relevant times, Ms. Doe's need for a sign language interpreter has been obvious.

14.     On or about October 26, 2016, Ms. Doe's daughter drove Ms. Doe to the Porter Emergency Department because the family was concerned about Ms. Doe's deteriorating mental state. Ms. Doe's sister and son accompanied them to Porter.

15.     Ms. Doe had reported to her family that she believed individuals at her workplace were conspiring against her and monitoring her using electronic means as well as highway signs.

16.     Ms. Doe's son called Porter from the car on the way to Porter to tell them that Ms. Doe was deaf and would need a sign language interpreter. Defendant's personnel responded that they would not have an on-site interpreter but would provide interpreting service through VRI equipment.

17.     VRI equipment uses computer technology, a microphone, and a camera to provide remote access to an interpreter via the internet.

18.     With VRI, although the medical personnel and the patient are all in the same room, the interpreter is not physically present. Rather, the interpreter participates via a remote video connection similar to Skype or Facetime.

19.     Because sign language is a purely visual language, any interruption in the clarity or fluidity of the video feed interrupts VRI communication in the same manner that poor fidelity, static, or "cutting out" interrupts spoken telephone communication.

20.     Sign language is a three-dimensional language, so any rendering on a two-dimensional screen by definition reduces the quality of communication.

21.     Because the camera is pointed at the deaf participant, the VRI interpreter typically cannot see any of the non-deaf participants. Therefore, if more than one non-deaf participant is speaking during the interaction, the VRI interpreter faces the same barriers in understanding as are typically faced during a conference call, for example, difficulty identifying who is speaking, difficulty hearing people who are located too far from the microphone, and background noise interfering with the intelligibility of the person speaking.

22.     On-site sign language interpreters carry no risk of such technical problems because they do not rely on technology to provide services.

23.     Further, all sign language interpreters abide by a strict code of professional conduct, mandating that interpreters maintain a high level of confidentiality in all aspects of their work.

24.     During Ms. Doe's evaluation in Porter's Emergency Department, Defendant attempted to provide interpretation by VRI, but encountered technical difficulties that rendered communication ineffective. When this happened, Defendant's personnel wrote notes with Ms. Doe.

25.     Some of Ms. Doe's communication in Porter's Emergency Department was interpreted via VRI and some took place by writing notes.

26.     Ms. Doe spent the night in the Emergency Department and was admitted to Porter's Behavioral Health Unit on October 27, 2016.

27.     Ms. Doe did not believe she needed to be admitted to the hospital.

28.     Ms. Doe remained in the Behavioral Health Unit at Porter until November 4, 2016, when she was discharged.

29.     While at Porter, Defendant's personnel diagnosed Ms. Doe with psychotic and delusional disorders, persecutory type.

30.     Throughout her stay, Ms. Doe and her family repeatedly asked Defendant's personnel for an on-site sign language interpreter.

31.     Despite experiencing technical difficulties that rendered VRI ineffective at the outset of Ms. Doe's hospitalization on October 26, Defendant did not make arrangements to provide an on-site sign language interpreter.

32.     Defendant repeatedly refused to provide an on-site interpreter and attempted to communicate with Ms. Doe in ways that were ineffective, such as through VRI.

33.     Defendant provided an on-site interpreter for a short period on November 2 and for Ms. Doe's discharge meeting on November 4. Otherwise, Ms. Doe had no access to on-site interpreting services and very little access to sign language of any kind for the duration of her hospitalization.

34.     On information and belief, Defendant provides therapeutic services, including but not limited to group therapy, throughout the day.

35.     Defendant recognized that Ms. Doe required an interpreter, noting in her medical records, "[i]nterpreter needed for pt r/t hearing disability," and otherwise repeatedly noting the need for interpreting services.

36.     Defendant's specific failures to communicate effectively with Ms. Doe include but are not limited to the examples set forth in this Complaint.

37.     Defendant relied on VRI to communicate with Ms. Doe during some scheduled meetings with medical personnel and for group therapy.

38.     The VRI device at Porter often did not function or functioned poorly, causing communication to be ineffective or break down entirely.

39.     During Ms. Doe's stay at Porter, VRI was not always available during the types of encounters in which hearing patients would ordinarily speak with medical personnel, for

example, an evaluation to determine suicidality, administration of medication, and therapeutic recreation.

40.     During Ms. Doe's stay at Porter, VRI was used in circumstances when its use is not appropriate.

41.     For example, the hospital attempted to use VRI for group therapy, where the interpreter had no way of identifying who was speaking, had difficulty hearing the various participants, and had other difficulties interpreting accurately.

42.     In addition, VRI communication was not appropriate for communication with Ms. Doe, because she was experiencing psychiatric problems.

43.     Further, the technical problems with the VRI equipment that appeared on the first night of Ms. Doe's hospitalization persisted throughout her stay.

44.     Defendant was aware of the problems with the VRI machine as noted in medical records:

   a.   "Due to the error with [VRI], we communicated via written messages."

   b.   Ms. Doe "has been attending some groups on the unit, but sign language translation machine has only been working intermittently."

   c.   VRI was "not working properly."

   d.   "[Ms. Doe] had difficulty at times in group using the [VRI] machine for communication assistance."

45.     Further, VRI was unavailable for incidental or unplanned communication, such as communication between patients in the Behavioral Health Unit.

46.     On a number of occasions, Defendant's personnel communicated with Ms. Doe using written notes.

47.     Writing notes with Ms. Doe is not an effective way of communicating with her, particularly due to the influence of the medication she received while at Porter.

48.     Further, writing notes is a more cumbersome process for communicating than speaking through an interpreter. Consequently, both participants in written communication tend to share less information than they would through an interpreter.

49.     Writing notes is also not an effective means of assessing a mental health patient's mental state, as the patient's reaction to communicating in an unnatural manner (*i.e.,* through writing in their second language) masks other indications of the patient's mental state.

50.     Defendant's personnel were aware that writing notes was not an effective means of communicating with Ms. Doe for therapeutic purposes, as evidenced by (among others) the fact that they indicated that Ms. Doe would require an outpatient therapist who knew sign language or would provide interpreting services.

51.     On several occasions, Defendant requested that Ms. Doe's daughter and sister interpret for Ms. Doe.

52.     Ms. Doe's sister, daughter, and son also interpreted in ad hoc situations due to Defendant's failure to provide effective communication.

53.     Relying on family members to interpret is inappropriate under any circumstances, and was especially so here where Ms. Doe was entitled to privacy and confidentiality in her communications with Defendant's personnel.

54.     On one occasion Defendant had Ms. Doe's daughter interpret for a group therapy session, violating both Ms. Doe's and other patients' privacy and confidentiality.

55.     The only time during Ms. Doe's hospitalization prior to the discharge meeting that Defendant provided her an on-site interpreter was during the morning of November 2, 2016.

56.     During this time, Defendant's personnel noted that Ms. Doe's mood improved and that she participated in group therapy.

57.     Defendant did not provide an interpreter in the afternoon or evening of November 2, 2016.

58.     On November 3, 2016, the interpreter cancelled and Defendant did not secure a replacement interpreter.

59.     Defendant noted that communication barriers negatively impacted Ms. Doe's care.

60.     Ms. Doe's medical records included the following:

a.  "She has a difficult time communicating, obviously, due to her deafness, and as a result, she feels very lost and alone here."

b.  "Note sign language as means of communication as reason for isolative behavior."

c.  "[C]ommunication challenges due to her deafness that are creating isolation and frustration."

d.  "[T]he patient was becoming increasingly frustrated on the unit as she felt isolated, unable to communicate with peers."

61.     In medical records, Defendant described these "communication challenges" as a "downside[] of ongoing hospitalization" that "may outweigh potential benefits."

62.     Thus, Defendant's failure to ensure effective communication with Ms. Doe caused Defendant to discharge Ms. Doe due to the limited benefit she would receive from continued hospitalization.

63.     On November 4, 2016, Defendant discharged Ms. Doe, providing on-site interpreting services for that meeting.

64.     The lack of an effective means of communicating with anyone at Porter -- both Defendant's personnel and the other inpatients -- diminished the benefit that Ms. Doe received from her time at Porter.

65.     Ms. Doe received a lesser benefit from her time at Porter than similarly situated individuals who are not deaf.

66.     Defendant's actions discriminated against Ms. Doe in violation of Title III, Section 504, and Section 1557.

67.     Ms. Doe was harmed by Defendant's discrimination and its failure to make its aids, benefits, and services available to her on a nondiscriminatory basis. The discrimination and lack of effective communication, themselves, harmed Ms. Doe. In addition, Ms. Doe experienced confusion, frustration, anger, and emotional harm from the experience of coping with her psychiatric illness without the communication, information, and interaction essential to any patient in that situation. Defendant's discrimination exacerbated the symptoms of Ms. Doe's mental illness.

68.     Ms. Doe would like to be able -- and intends, if necessary -- to avail herself of the services of Porter Hospital and other Centura facilities when Centura ceases its discrimination on the basis of disability.

69.     In December 2017, Ms. Doe, through undersigned counsel, sent a letter to Defendant seeking to resolve the matter without resorting to litigation. Although the parties have worked together productively and in good faith, they have not yet been able to reach agreement.

## FIRST CLAIM FOR RELIEF
### (For violation of Title III of the ADA)

70.     Plaintiff incorporates the allegations set forth in the remainder of this Complaint as if fully set forth herein.

71.     Title III of the ADA prohibits discrimination on the basis of disability by those who own, operate, lease or lease to places of public accommodation. 42 U.S.C. § 12181 *et seq.*

72.     Defendant Centura owns and operates hospitals, including but not limited to Porter, which are places of public accommodation as defined in Title III. *Id*. § 12181(7)(F).

73.     Because she is deaf, Ms. Doe is an individual with a disability within the meaning of the ADA. *Id.* § 12102.

74.     Defendant Centura discriminated against Ms. Doe on the basis of disability in violation of Title III and its implementing regulations as more fully described herein.

75.     Such discrimination includes but is not limited to the failure to provide auxiliary aids and services necessary to ensure effective communication, providing unequal benefits on the basis of disability, failure to make reasonable modifications to policies, practices, and procedures, and using methods of administration that have the effect of discriminating on the basis of disability.

76.     Ms. Doe has been injured and aggrieved by and will continue to be injured and aggrieved by Defendant Centura's discrimination as more fully set forth herein.

## SECOND CLAIM FOR RELIEF
### (For violations of Section 504 of the Rehabilitation Act)

77.     Plaintiff incorporates the allegations set forth in the remainder of this Complaint as if fully set forth herein.

78.     Section 504 prohibits discrimination on the basis of disability by recipients of federal financial assistance. 29 U.S.C. § 794.

79.     Defendant Centura receives federal financial assistance.

80.     Because she is deaf, Ms. Doe is an individual with a disability within the meaning of the Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

81.     Centura discriminated against Ms. Doe on the basis of disability in violation of Section 504 and its implementing regulations as more fully described herein.

82.     Such discrimination includes but is not limited to the failure to provide auxiliary aids and services necessary to ensure effective communication, failure to provide aids, benefits and services as effective as those provided to others, failure to make reasonable modifications to policies, practices, and procedures, use of methods of administration that had the effect of discriminating on the basis of disability and of substantially impairing the accomplishment of the objective of Centura's program or activity with respect to Ms. Doe, and failure to provide Ms. Doe with meaningful access to Centura's services.

83.     Ms. Doe was qualified to participate in Centura's aids, benefits, and services within the meaning of Section 504.

84.     Centura excluded Ms. Doe from participation in, denied her the benefits of and subjected Ms. Doe to discrimination under its programs and services, solely on the basis of her disability, thereby violating Section 504.

85.     Centura's actions described in this Complaint were intentional and/or were taken with deliberate indifference to the strong likelihood that pursuit of its questioned policies would result in a violation of Ms. Doe's rights under Section 504.

86.     As a direct and proximate result of the acts, omissions, and violations alleged above, Ms. Doe has suffered damages, including but not limited to pain and suffering, inconvenience, and emotional distress.

87.     Ms. Doe has been injured and aggrieved by and will continue to be injured and aggrieved by Centura's discrimination as more fully set forth herein.

**THIRDCLAIM FOR RELIEF**
**(For violations of Section 1557 of the ACA)**

88.     Plaintiff incorporates the allegations set forth in the remainder of this Complaint as if fully set forth herein.

89.     Section 1557 of the ACA prohibits discrimination on the basis of disability by health programs and activities any part of which receive federal financial assistance; it does this by incorporating by reference Section 504 of the Rehabilitation Act. 42 U.S.C. § 18116(a).

90.     Defendant Centura is a health program or activity within the meaning of 42 U.S.C. § 18816(a).

91.     Defendant Centura receives federal financial assistance.

92.     Because she is deaf, Ms. Doe is an individual with a disability within the meaning of the Section 504. 29 U.S.C. § 705(9) (incorporating by reference 42 U.S.C. § 12102).

93.     Centura discriminated against Ms. Doe on the basis of disability in violation of Section 1557 and its implementing regulations as more fully described above.

94.     Such discrimination includes but is not limited to the failure to provide auxiliary aids and services necessary to ensure communication as effective as that with others, failure to provide aids, benefits and services as effective as those provided to others, failure to make reasonable modifications to policies, practices, and procedures, use of methods of administration that had the effect of discriminating on the basis of disability and of substantially impairing the accomplishment of the objective of Centura's program or activity with respect to Ms. Doe, and failure to provide Ms. Doe with meaningful access to Centura's services.

95.     Ms. Doe was qualified to participate in Centura's aids, benefits, and services within the meaning of Section 504 as incorporated in Section 1557.

96.     Centura excluded Ms. Doe from participation in, denied her the benefits of and subjected Ms. Doe to discrimination under its programs and services solely on the basis of her disability, thereby violating Section 1557.

97.     Centura's actions described in this Complaint were intentional and/or were taken with deliberate indifference to the strong likelihood that pursuit of its questioned policies would result in a violation of Ms. Doe's rights under Section 1557.

98.     As a direct and proximate result of the acts, omissions, and violations alleged above, Ms. Doe has suffered damages, including but not limited to pain and suffering, inconvenience, and emotional distress.

99.     Ms. Doe has been injured and aggrieved by and will continue to be injured and aggrieved by Centura's discrimination as more fully set forth herein.

**WHEREFORE, Plaintiff respectfully requests:**

1.      That this Court assume jurisdiction;

2.      That this Court declare the actions of Defendant described in this Complaint to be in violation of Title III of the ADA, Section 504 of the Rehabilitation Act, and Section 1557 of the ACA;

3.      That this Court enter an injunction ordering Defendant to cease discrimination on the basis of disability against deaf patients, including but not limited to Ms. Doe, by (among other things) establishing, publicizing, and following a procedure to ensure effective communication with individuals who are deaf or hard of hearing;

4.      That this Court award Ms. Doe compensatory damages pursuant to Section 504 and Section 1557;

5.      That this Court award Ms. Doe and/or her attorneys her reasonable attorneys' fees and costs; and

6.      That this Court award such additional or alternative relief as may be just, proper, and equitable.

/
/
/
/
/
/
/
/
/
/
/
/
/

Respectfully Submitted,

/s/Amy F. Robertson
Amy F. Robertson
Civil Rights Education and Enforcement Center
104 Broadway, Suite 400
Denver, CO 80203
Phone: (303) 757-7901
arobertson@creeclaw.org

Caroline E. Jackson
The National Association of the Deaf Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
301.587.1788
caroline.jackson@nad.org

Date: October 12, 2018